IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

ESTELLA PRATT, individually
and as Personal Representative
for the Estate of JEFFREY
THOMAS, deceased,

                    Plaintiff,

        v.

CITY OF CAMDEN, et al.,

                    Defendants.

HONORABLE JEROME B. SIMANDLE

        Civil Action
    No. 13-6830 (JBS-AMD)


        **OPINION**

APPEARANCES:

Melvin M. Wright, Jr., Esq.
LAW OFFICES OF MELVIN M. WRIGHT, JR., LLC
1100 Taylor Lane, Unit 9
Cinnaminson, NJ 08077
        -and-
Anthony H. Ogozalek, Esq.
LAW OFFICE OF ANTHONY H. OGOZALEK
1100 Taylor Lane, Unit 9
Cinnaminson, NJ 08077
        Attorneys for Plaintiff

Daniel Edward Rybeck, Esq.
John C. Eastlack, Jr., Esq.
Lilia Londar, Esq.
WEIR & PARTNERS
250 Fries Mill Road, 2nd Floor
Turnersville, NJ 08012
        Attorneys for City Defendants

Marvin L. Freeman, Esq.
Vincent J. Rizzo, Jr., Esq.
STATE OF NEW JERSEY
OFFICE OF THE ATTORNEY GENERAL
25 Market Street, PO Box 112
Trenton, NJ 08625
        Attorneys for State Defendants

**SIMANDLE**, District Judge:

## I.    INTRODUCTION

In this matter, Plaintiff Estella Pratt ("Pratt" or "Plaintiff"), individually and as personal representative for the Estate of Jeffrey Thomas ("Thomas"), deceased, filed a civil action in connection with a police shooting that resulted in the death of her son, Mr. Thomas, on November 12, 2011. Pending before the Court are two motions for summary judgment: one filed by Defendants Terhan Hinson ("Officer Hinson" or "Hinson"), Mark Saunders ("Officer Saunders" or "Saunders"), John S. Thomson ("Chief Thomson" or "Thomson"), and the City of Camden (collectively, "the City Defendants") [Docket Item 138]; and the second filed by Robert May ("Trooper May" or "May"), Matthew Moore ("Trooper Moore" or "Moore"), Jerome Moran ("Trooper Moran" or "Moran"), William Nuemann ("Trooper Nuemann" or "Nuemann"), Maurice Smith ("Trooper Smith" or "Smith"), Rick Fuentes ("Superintendent Fuentes" or "Fuentes"), the New Jersey Department of Law & Public Safety, the New Jersey State Police ("NJSP"), and the State of New Jersey (collectively, "the State Defendants"). [Docket Item 139.]

All discovery having been concluded, the principal issues to be decided, among others, are: (1) whether, giving all reasonable inferences to Plaintiff, Officers Hinson and Saunders (collectively, "the individual Officers") and/or Troopers May,

2

Moore, Moran, Nuemann, and Smith (collectively, "the individual Troopers) are entitled to qualified immunity; (2) whether there are genuine issues of material fact from which a jury could reasonably find that the use of deadly force by the individual Officers and Troopers violated Thomas' Fourth and Fourteenth Amendment rights and, if so, whether the City of Camden may be subject to § 1983 municipal liability under <u>Monell</u>; and (3) whether Chief Thomson and/or Superintendent Fuentes failed to adequately train the individual Officers and Troopers to properly confront mentally-disturbed persons, such as Thomas.

For the reasons discussed below, the motions for summary judgment will be granted in part and denied in part. The Court will also defer ruling on summary judgment as to certain Counts involving the City of Camden and Chief Thomson, in his official capacity, and ask for supplemental briefing from Plaintiff and the City Defendants on the admissibility of Dr. James Williams's report and testimony. If necessary, the Court will then convene a <u>Daubert</u> hearing. After the Court rules on the admissibility of Dr. Williams's report and testimony and decides whether to grant summary judgment on the remaining Counts, the case will be set for Final Pretrial Conference or trial.

**II. BACKGROUND**

    **A. Factual Background[1]**

        1. <u>Thomas's Prior Mental Health Issues</u>

The late Jeffrey Thomas had a history of psychiatric problems. According to his mother, in April 2011, Thomas had been "faulting himself for not being there for his cousin that was killed . . . He wasn't himself. They said he was fine. He just needed sleep." [Ex. 1 to Docket Item 138-2 ("Pratt Dep.") at 31:4-17.] After going to the hospital, Thomas was diagnosed with insomnia. (<u>Id.</u> at 34:11-15.)

In early October 2011, Thomas started complaining about serious headaches. (<u>Id.</u> at 34:20-21.) According to Pratt, "he [also] just kept saying, Mom, Mother, and when he called me Mom, I knew it was him. When he called me Mother, I knew it wasn't him. It seemed like two different people." (<u>Id.</u> at 34:20-25.) On or about October 9, 2011, Pratt called an ambulance to transport Thomas to Our Lady of Lourdes hospital because he "kept saying that he had headaches and he couldn't remember nothing." (<u>Id.</u> at

---

[1] For purposes of the instant motion and pursuant to Local Civil Rule 56.1, the Court looks to the Second Amended Complaint [Docket Item 43] when appropriate, the City Defendants' Statement of Undisputed Material Facts [Docket Item 138-1], the State Defendants' Statement of Undisputed Material Facts [Docket Item 139-2], Plaintiff's Responses to Statement of Material Facts [Docket Item 142-5; Docket Item 143-1], and related exhibits and documents.

31:21-32:4.) Shortly after Thomas was admitted, "[t]hey put him in crisis [treatment]." (Id. at 32:6.)

On October 10, 2011, Thomas was transferred from Our Lady Lourdes to Kennedy Hospital in Cherry Hill, New Jersey. [Ex. 4 to Docket Item 138-2 ("Kennedy Hospital Records") at 1.] There, Thomas was initially diagnosed with "Schizoaffective Disorder/Cannabis Abuse." (Id. at 2.) After he refused to sign consent forms to be admitted (id. at 4, 10), a nurse recommended that Thomas be involuntarily committed/hospitalized for "psychosis, medication stabilization." (Id. at 15-16.) Dr. Amy McAndrew subsequently certified that Thomas should be involuntarily committed because, among other reasons "[t]his patient, if not committed, would be a danger to self or others or property by reason of [a] mental illness." (Id. at 17-24.) On October 19, 2011, Thomas was prescribed Haldol, Cogentin, and Trazodone,[2] and discharged from Kennedy Hospital. (Id. at 44.)

2.    November 11-12, 2011 - the Night of the Shooting

As of November 11, 2011, one of Pratt's daughters and a six-month-old granddaughter were living with her at 1153 Whitman Street in Camden, New Jersey. [Ex. 2 to Docket Item 138-2 ("Wallace Dep.") at 10:17-11:24.] Thomas's girlfriend, Ciara

_____

[2] Pratt does not know whether her son was taking his prescribed Haldol after he was released from Kennedy Hospital (Pratt Dep. at 38:13-24), but Wallace testified that Thomas stopped taking his medicine before November 11, 2011. [Wallace Dep. at 35:1-4.]

Wallace, had also been living at the Pratt residence since December 2010. (Pratt Dep. at 30:5-9.) Thomas, however, was not living at his mother's home at this time because he had a prior criminal conviction and the Division of Youth and Family Services precluded him from living in the same house as Pratt's six-month-old granddaughter. (Wallace Dep. at 11:25-13:1; 30:12-24.)

At or around 8:00 P.M. on November 11, 2011, Thomas arrived at the Pratt residence and, about an hour later, Thomas, Pratt, Wallace, Pratt's daughter, and Pratt's granddaughter ate dinner together. (Pratt Dep. at 43:1-2.) Around 9:30 P.M., Thomas and Wallace got in bed to go to sleep. (Wallace Dep. at 49:22-50:1.) Around 10:00 or 10:30 P.M., Thomas woke up and told Wallace he was going to the gas station to get something to drink and purchase marijuana to smoke. (Id. at 50:9-51:6.) Around the same time, Pratt asked Thomas to go out to buy her a soda, and Thomas left the house. (Pratt Dep. at 43:2-3.) Sometime between 11:00 P.M. and 12:00 A.M., Thomas returned to the Pratt residence with marijuana, but without the soda his mother had requested. (Wallace Dep. at 52:1-9; Pratt Dep. at 43:4-9.) When Thomas returned, Pratt asked him "didn't I ask you to get me something?" and Thomas responded, "yes, Mother. . . . I'm going to get you a soda right now." (Id. at 43:9-15.) Thomas then left the house again. (Id. at 43:16.)

When Thomas returned to the Pratt residence around 12:30 A.M., he "said something scary to [Wallace] at the door, and [she] told him [she] wasn't letting him in." (Wallace Dep. at 52:19-21.) Wallace does not recall specifically what Thomas said, but she "just know[s] it was scaring [her]." (Id. at 52:22-24.) Wallace left the front door locked and went upstairs to Pratt's bedroom, but did not tell Pratt about the nature of the argument between Wallace and Thomas. (Id. at 53:4-12; Pratt Dep. at 51:18-52:4.)

From outside the house, Thomas began shouting "Ciarra Wallace, open the door . . . we got to talk, we got to talk." (Id. at 52:12-18.) Wallace responded to Thomas: "I'm not talking to you like that. I'm not talking to you like that." (Id. at 52:19-20.) Thomas then began kicking the door "really crazy." (Id. at 53:10.) At some point, Pratt went to the window and told Thomas to "[g]o get my soda. You didn't even bring me my soda back." (Id. at 53:18-21.) Thomas told Pratt, "I'm going to get it right now, Mother. I'm going to get it right now." (Id. at 53:22-23.) Before Thomas left, Wallace told him they were calling the police. (Wallace Dep. at 61:12-16.) Thereafter, Wallace saw Thomas walk away from the house. (Id. at 61:20-21.)

Around this time, Wallace and Pratt called 9-1-1. (Pratt Dep. at 43:18.) According to a transcript of the 9-1-1 call, Wallace told the operator, "[m]y boyfriend is going crazy. . . .

7

My buddy's acting a fool. I got him out of crisis like three times and now he's acting a fool again." [Ex. 36 to Docket Item 138-7 ("9-1-1 Tr.") at 2:9-15.] Pratt then got on the phone and told the police, "he didn't take his medication and he's banging on my door talking about . . . shotguns, fuck the cops and all this stuff. . . . I'm scared. I got a baby in here." (Id. at 2:18-25.) Pratt described Thomas to the 9-1-1 operator and said, "He's just outside acting a fool." (Id. at 3:6-7.)

Officer Hinson was assigned the emergency call. [Ex. 5 to Docket Item 138-5 ("Hinson Dep.) at 78:1-3.] Five or ten minutes after Thomas left, but before Hinson arrived at the scene, an ambulance came to the Pratt residence. (Pratt Dep. at 43:22-25.) By the time Officer Hinson arrived, ambulance personnel were getting ready to leave because, as they told Officer Hinson, "there is nothing here." (Hinson Dep. at 80:15-81:5.)

Hinson was initially greeted at the Pratt house by Wallace, who immediately directed him upstairs to speak with Pratt. (Id. at 81:6-10.) According to Officer Hinson, after he asked Pratt what happened, she kept looking at Wallace, which made Hinson think "something wasn't quite right," and that the situation was more serious than a request for an ambulance. (Id. at 82:4-14.) Hinson testified that he spoke with Pratt and Wallace for approximately forty (40) minutes, during which time Pratt told him that, because Thomas was banging on the door, she instructed

8

him to go get her a soda in an effort to defuse the situation. (Id. at 82:4-25.)

Right before he left, Hinson testified that he told Pratt and Wallace "come on, tell me what's going on here," at which time Wallace told him that Thomas "got a gun." (Id. at 84:7-15.) According to Officer Hinson, he then said to Pratt, "if [Thomas] has a gun, I don't know what to tell you, if he points the gun at somebody, we might have to do what we have to do. And we both know what that is. We will try, but we might have to do what we have to do if he points the weapon at somebody." (Id. at 86:2-8.) Hinson left the Pratt residence, completed his report, and went to fill his vehicle at a nearby gas station. (Id. at 86:9-87:4.)

Pratt remembers her encounter with Officer Hinson somewhat differently. According to Pratt, she quickly informed Officer Hinson that Thomas was diagnosed as a schizophrenic and told him "I need you to help me get him back in crisis [treatment]." (Pratt Dep. at 44:4-5; 59:1-2.) In response, Officer Hinson apparently asked if Thomas had a gun because, as Hinson told Pratt, "all young Camden boys have a gun." (Id. at 44:5-6.) Pratt testified that Officer Hinson then asked a series of other "irrelevant" questions, including whether Thomas had a job and how he paid for his car. (Id. at 44:9-16; 59:7-14.) Pratt then reiterated that "I need you to help me get my son back in crisis

because he is sick. He just got out and he is not ready to be released yet." (Id. at 59:14-16.) According to Pratt, before leaving, Officer Hinson asked, "you sure he ain't got a gun?" and then said to Pratt, "well, I'm telling you, you all mother [sic] spoil these sons and then you want us to get them knowing they have guns. If he has a gun, we will have to do what we got to do." (Id. at 59:22-60:3.) As he left, Officer Hinson told Pratt, "Ma'am, we are going to go find Jeffrey," and walked away. (Id. at 60:9-11.)

Wallace recalls the conversation with Officer Hinson similarly to Pratt. According to Wallace, Pratt first told Officer Hinson, "my son is sick, he was just released from the hospital." (Wallace Dep. at 62:22-24.) Officer Hinson then asked Pratt how old Thomas was, where he worked, who was paying for his car insurance, and whether he had previously been charged with any crimes. (Id. at 62:24-63:14.) Wallace remembers Pratt stopping Hinson at this point and saying "this is irrelevant to the situation. My son is still out there, sick, and we are having a conversation when anything could be going on out there." (Id. at 63:12-16.) Wallace testified that Hinson responded, "I'm just trying to figure out what type of brother he is." (Id. at 63:16-17.) According to Wallace, Hinson also asked Pratt if Thomas was "spoiled," and said "you mothers want us to go out and rescue your kids knowing they have guns, and

you all need to stop spoiling your kids. You ought to put him on a leash." (Id. at 63:21-64:1.) Before leaving, Wallace remembers Officer Hinson telling Pratt that, in order to apprehend him, "we got to do what we got to do." (Id. at 63:20-21.)

A few minutes after Officer Hinson left the Pratt residence, Thomas returned and began jumping up and down outside the house and calling Wallace's name. (Pratt Dep. at 44:16-20; Wallace Dep. at 68:1-4.) Looking out the window, Wallace testified that she saw Thomas had a gun in his hand at this time. (Id. at 56:4-11.) Pratt then called the police again and, according a transcript of the second 9-1-1 call, told the operator, "Please tell them to come on. Please. My son's outside with a gun." (9-1-1 Tr. at 6:13-14; 23-25.)

Officer Saunders was assigned to respond to the second call for a "man with a gun." [Ex. 19 to Docket Item 138-5 ("Saunders Dep.") at 39:20-41:4.] While refueling his car, Officer Hinson also heard the dispatcher relay the second 9-1-1 call on his radio. (Hinson Dep. at 87:4-6.) When Hinson discovered that Saunders had been assigned the call, he notified the dispatcher and Saunders that he would assist. (Id. at 87:4-88:3; Saunders Dep. at 24:21-25:1.) Hinson testified that, at this time, he decided: "I'm going to get with Mark, it's going to take us a little while, we're going to party up and come up with a plan how to get this guy. Because if we didn't get him, in the sense

when I say get him, get him what he needed because basically get him to the mental — to Steinature." (Hinson Dep. at 88:11-17.)

Around this time, Troopers Robert May and Maurice Smith, who were in a vehicle together on patrol in Camden City, overheard the radio communications regarding Thomas having a gun and decided to respond to the scene. [Ex. 32 to Docket Item 132 ("Smith Dep.") at 31:2-9; 32:15-23.] Troopers Jerome Moran, Matthew Moore, and William Neumann were in another vehicle together in Camden City when they too overheard the radio call, and also proceeded to the scene. [Ex. 35 to Docket Item 138-7 ("Moore Dep.") at 26:22-27:12; Ex. 37 to Docket Item 138-7 ("Moran Dep.") at 21:22-22:2, 29:4-13, 36:9-37:19; Ex. 38 to Docket Item 138-7 ("Neumann Dep.") at 26:19-2.]

Before arriving at Pratt's home, Officers Hinson and Saunders "sat at West Jersey Hospital which is a few blocks away from the house and . . . came up with a little plan on how [they] were going to do it. And the plan would have been to come up . . . use the tactical approach [and] blackout [their vehicles], [Hinson] will take him one side of the street and [Saunders] will take the other side." (Hinson Dep. at 88:21-90:6.) Hinson and Saunders then approached Pratt's house with their car lights completely off. (Id. at 89:10-13.) While Hinson and Saunders approached a dark purple or blue car located near the Pratt residence, Hinson saw a man getting into or out of the

vehicle. (Id. at 89:13-20; 94:10-12.) As the man saw the
officers approaching, "he motioned like he didn't know what to
do, whether to get back in the car or run away from the car at
that time." (Id. at 95:3-5.) Hinson and Saunders then attempted
a "felony car stop," which Hinson described as "wait[ing],
giving out verbal commands without using our weapon, using
instructive authority meaning training my weapon on this
individual which I believe is armed." (Id. at 95:9-15.) Saunders
and Hinson next assumed a position behind their car doors, and
told the man "get out, get on the ground." (Id. at 96:5-6.)

Rather than listen to the Officers' commands, the man fled
on foot. (Id. at 96:8.) According to Saunders, when the man
fled, his car started rolling downhill and hit Officer Saunders'
car. (Saunders Dep. at 32:17-33:4.) Pratt testified she heard
what sounded like a car accident and was told by Wallace that
Thomas had jumped out of the car and started running. (Pratt
Dep. at 44:23-45:3.)

Officer Hinson testified that he told Saunders to stay with
the vehicle to prevent the man from returning to his car.
(Hinson Dep. at 96:24-97:5.) Hinson then re-holstered his
weapon, entered his own vehicle, and drove in the direction in
which the man had taken off. (Id. at 98:3-7.) After turning the
corner and not seeing the man, Hinson decided to park and exit
his vehicle to look around. (Id. at 99:1-17.) Hinson initially

left his weapon on a seat of his car. (Id. at 99:7-10.) Quickly after exiting his vehicle, Hinson heard a noise in the bushes nearby and, while reaching back into his vehicle to grab his weapon, saw a man emerge from the bushes, walk past him, and head back in the direction from which Hinson had just come. (Id. at 99:17-18, 101:9-12.) Hinson, believing the individual coming out of the bushes was Thomas, followed the man on foot from a distance of approximately four to five houses behind him. (Id. at 101:15-102:4.) Hinson followed the man back toward the location of Saunders' vehicle. (Id. at 104:20-104:2.) Shortly before reaching Saunders, Hinson shouted out: "hey buddy, can I talk to you for a minute? Come here. Come here, bud." (Id. at 107:3-4.) According to Hinson, the man looked back and started to walk "real fast," so Hinson again said, "hey, come here, man." (Id. at 107:6-11.) Around the same time, Saunders started pursuing the man from a distance of ten to fifteen feet, and verbally commanded the man to come back. (Saunders Dep. at 51:13-52:1.)

As the man reached the intersection of Everette Street and Rose Street, an NJSP vehicle pulled up full of State Troopers in clearly marked police regalia. (Hinson Dep. at 107:11-23.) Upon seeing Thomas, Trooper May exited the vehicle and yelled "State Police!" at which time the man began to run. [Ex. 3 to Docket Item 138-2 ("May Dep.") at 42:24-45:3.] Hinson and Saunders both

heard the NJSP Troopers yell verbal commands to Thomas. (Hinson
Dep. at 108:24-25; Saunders Dep. at 62:17-63:2.) The man
continued to run across Rose Street towards a park located
between Whitman Street and Everette Street. [Hinson Dep. at
108:24-109:9; see also Ex. 33 to Docket Item 138-6.]

What happened next is heavily contested by the parties.

On one hand, all seven Officers and Troopers testified that
they either saw or believed they saw the man (later identified
as Thomas) holding, pointing, racking, and/or shooting or trying
to shoot a gun in the direction of law enforcement officers
before they fired any shots. (See Hinson Dep. at 112:22-114:5;
Saunders Dep. at 72:7-10; May Dep. at 58:16-22; Moran Dep. at
48:23-49:23, 51:13-52:11; Neumann Dep. at 46:13-25; Smith Dep.
at 68:1-10; Moore Dep. at 41:17-42:13.) Trooper Neumann also
testified that he retrieved a weapon from Thomas's hand after
the shooting stopped and Thomas was laying on the ground.
(Neumann Dep. at 57:6-18.)

On the other hand, Pratt testified that she saw Thomas from
her window[3] "facing [her] with his hands up" right before he was

_____

[3] From a map in evidence [Ex. 33 to Docket Item 138-6], which the
parties stipulated at oral argument as accurate to scale, it
appears that the distance from the Pratt house (where Pratt and
Wallace observed the incident) to Mr. Thomas's body in the
street was approximately 160 feet down Rose Street. The diagram
also depicts two parked cars along the curb obscuring the line
of sight between the Pratt house and the shooting scene down the
block along the same curb.

shot, and that she clearly saw "[h]e had his hands up and I never seen nothing in his hands." (Pratt Dep. at 45:7-8, 65:3-17.) Wallace testified that she observed the incident from the bedroom window, did not see a gun in Thomas's hand at any point, and that, right before he was shot, Thomas stopped, put his hands up, and got down in a surrendering position with one knee down and his hands up. (Wallace Dep. at 77:23-79:12.) Pratt's neighbor, Sonia Rodriguez ("Rodriguez"), testified that, after the police told Thomas to surrender, "Jeffrey doesn't say nothing. He was saying nothing. He just do like this, bend down like that, and they started shooting on him." [Ex. 34 to Docket Item 138-7 ("Rodriguez Dep.") at 37:20-38:5.] Yet another neighbor, David Harris ("Harris"), testified that he observed Thomas being shot while "he was trying to go down, like he was trying to, like, go down, like, and then that's when they just start shooting." [Ex. 39 to Docket Item 138-7 ("Harris Dep.") at 47:4-12.][4]

At the time of the incident, NJSP had a Standard Operating Procedure ("SOP") in place to deal with the "Handling of Mentally Ill Persons." [Ex. A to Docket Item 142-1, NJSP SOP F52, effective May 20, 2011.] CCPD enacted its own SOP for the

---

[4] Harris also testified that he could not see if there was anything in Thomas's hands because the "lighting was not good enough." (Id. at 48:4-16.)

16

"Handling of Emotionally Disturbed Persons" two weeks after the
shooting, on November 23, 2011. [Ex. B to Docket Item 142-1,
Camden City Police SOP Vol. 3, Chap. 21, effective Nov. 23,
2011.]

      3.   Post-Shooting Investigation

A post-shooting investigation conducted by the NJSP found
that forty-four (44) bullets were ultimately discharged by the
two CCPD Officers and five NJSP Troopers, twenty-two (22) by
Officers Hinson and Saunders and twenty-two (22) by Troopers
May, Moore, Moran, Nuemann, and Smith. [Ex. D to Docket Item
142-6 ("NJSP Rep.") at 27.] A post-mortem examination of
Thomas's body by the State Medical Examiner, Dr. Robert
Mitchell, further revealed that Thomas had been struck by
fourteen (14) bullets. (Id.) Thomas's body remained outside, in
view of his mother, but perhaps half a block from her physical
location near the corner of Rose and Whitman, for nearly eight
hours while the police investigated the scene. [Ex. C to Docket
Item 142-1 at 96:24-25.]

A .380 handgun was recovered by NJSP Crime Scene
Investigation Unit – South Unit from or near Thomas's person
after the shooting. (NJSP Rep. at 27.) A subsequent examination
of the handgun revealed that the weapon held eleven (11) rounds
when fully loaded, but only contained ten (10) .380 caliber
rounds at the time it was recovered. (Id.) Notwithstanding the

NJSP investigators' finding, Defense expert Emmanuel Kapelsohn opined that the .380 handgun recovered at the scene had a capacity for twelve (12) bullets. [Ex. 43 to Docket Item 138-7 ("Kapelsohn Rep.") at 14-15.] "It is undisputed [Thomas] previously accidentally discharged a bullet into his car days prior to his death" (State Defs. Statement of Material Facts at ¶ 166; see also NJSP Rep. at 27), which the parties appear to agree explains one (1) missing bullet from the gun.

On September 22, 2017, Detective Janessa Jones, the Shooting Response Team investigator assigned to the shooting death of Thomas, signed a Declaration stating that "the Attorney General Shooting Review Team did not find any evidence that the gun in the possession of Jeffrey Thomas, described as a .380 semiautomatic pistol, discharged during the shooting incident on November 12, 2011." [Ex. F to Docket Item 142-2 ("Jones Decl.") at ¶ 7.] Nevertheless, Mr. Kapelsohn states in his report that, because Thomas's weapon had the capacity to carry twelve (12) bullets, it is possible Thomas fired at least one round on the night he was killed. (Kapelsohn Rep. at 14-15, 17.)

**B. Procedural History**

On June 19, 2015, Plaintiff filed the Second Amended Complaint, which brings twelve counts against the City and State Defendants: (1) Violation of the Fourth, Fifth, and Fourteenth Amendments of U.S. Constitution under 42 U.S.C. § 1983 against

18

all Defendants (Count One); (2) Violation of the Fourth, Fifth, and Fourteenth Amendments of U.S. Constitution under 42 U.S.C. § against Defendants Thomson and Fuentes (Count Two); (3) Violation of the Fourth, Fifth, and Fourteenth Amendments of U.S. Constitution under 42 U.S.C. § 1983 against Defendants Saunders, Hinson, May, Smith, Neumann, Moore, and Moran, in their individual capacities (Count Three); (4) Violation of the Americans with Disabilities Act under 42 U.S.C. §§ 12111-12117 against Defendants New Jersey and City of Camden (Count Four); (5) Violation of the Rehabilitation Act of 1973 against Defendants New Jersey and City of Camden (Count Five); (6) Violation of the New Jersey Law Against Discrimination ("NJLAD") against all Defendants (Count Six); (7) Negligence against Defendant City of Camden (Count Seven); (8) Negligence against Defendants Thomson and Fuentes (Count Eight); (9) Negligence against Defendants Saunders, Hinson, John Does 3-20, May, Smith, Neumann, Moore, Moran, and New Jersey State Police Troopers 26-30, in their individual capacities (Count Nine); (10) Intentional Infliction of Emotional Distress ("IIED") against all Defendants (Count Ten); (11) Wrongful Death under N.J.S.A. § 31:1 against all Defendants (Count Eleven); and (12) Violation of the New Jersey Constitution and New Jersey Civil Rights Act, N.J.S.A. § 10:6-2, against all Defendants (Count Twelve). [Docket Item 43 ("Second Am. Compl.") at ¶¶ 46-117.]

In due course, the City Defendants and State Defendants filed separate motions for summary judgment as to all Counts on a variety of theories, including the doctrine of qualified immunity. [Docket Items 138 & 139.] Plaintiff timely opposed both motions [Docket Items 142 & 143], and both sets of Defendants filed reply briefs. [Docket Items 148 & 149.]

On June 19, 2018, the Court convened oral argument on the pending motions. [Docket Item 152.] At the oral argument, both parties made several concessions and clarifications on the record.[5] **First**, Plaintiff agreed to dismiss the Fifth Amendment claims under § 1983 in Counts One, Two, and Three, and confirmed that Counts Four and Five were voluntarily dismissed. **Second**, Plaintiff conceded that the Eleventh Amendment of the U.S. Constitution isolates the State Defendants, in their official capacities, from liability under § 1983, and clarified that its Monell claims in Counts One and Two are against the City of Camden and Chief Thomson. **Third**, Plaintiff also clarified that the Monell claims in Counts One and Two are based upon the City of Camden's alleged failure to properly train its law enforcement officers in handling mentally-disturbed persons, and not for failure to properly hire, supervise, discipline, and/or

---

[5] The Court appreciates the parties' concessions and clarifications at oral argument, which will be incorporated into this Opinion where appropriate.

control those officers. **Fourth**, Plaintiff clarified that the negligence claims in Counts Seven and Eight against the City of Camden, Chief Thomson, and Superintendent Fuentes are likewise limited to allegations of negligent training of law enforcement officers involved in the shooting, and not for negligent hiring, supervising, disciplining, and/or retaining those officers. **Fifth**, the City and State Defendants both conceded that Plaintiff has met the threshold of the New Jersey Tort Claims Act because Thomas suffered a "permanent loss of a bodily function." See generally Brooks v. Odom, 696 A.2d 619 (N.J. 1997). **Finally**, the parties appeared to agree that there is, at a minimum, a genuine factual dispute as to whether Thomas pointed his gun toward law enforcement officers, which will ultimately need to be resolved by the fact-finder at trial.

## III. STANDARD OF REVIEW

At summary judgment, the moving party bears the initial burden of demonstrating that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); accord Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Once a properly supported motion for summary judgment is made, the burden shifts to the non-moving party, who must set forth specific facts showing that there is a genuine issue for trial. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986).

A factual dispute is material when it "might affect the outcome of the suit under the governing law," and genuine when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. at 248. The non-moving party "need not match, item for item, each piece of evidence proffered by the movant," but must present more than a "mere scintilla" of evidence on which a jury could reasonably find for the non-moving party. Boyle v. Cty. of Allegheny, 139 F.3d 386, 393 (3d Cir. 1998) (quoting Anderson, 477 U.S. at 252).

## IV. DISCUSSION

Plaintiff generally alleges that two CCPD Officers and five NJSP Troopers improperly exercised deadly force when they shot and killed Thomas while responding to a pair of 9-1-1 calls about a disturbed man with a gun. Plaintiff further alleges, among other claims, that the City of Camden and State of New Jersey, and/or their top law enforcement officers, failed to adequately train the individual Officers and Troopers to properly confront mentally-disturbed persons, such as Mr. Thomas. The City and State Defendants move for summary judgment on several grounds, each of which the Court addresses in turn.

### A. Qualified Immunity

In moving for summary judgment, Defendants first argue that the individual Officers (Hinson and Saunders) and Troopers (May, Moore, Moran, Nuemann, and Smith) are entitled to qualified

immunity because they each acted in good faith and their use of deadly force was justified and proper under the circumstances. [Docket Item 138-8 ("City Defs. Br.") at 7-9; Docket Item 139-1 ("State Defs. Br.") at 21-33.] Plaintiff, on the other hand, argues that none of the individual Officers or Troopers are entitled to qualified immunity because "a reasonable jury could conclude that five NJSP Troopers and two Camden Police Officers collectively discharging 44 bullets in the direction of an unarmed man, whereby 13 [sic] bullets fatally penetrated his body is unjustifiable excessive force." [Docket Item 142 ("Pl. Br. in  to State Defs.") at 25; see also Docket Item 143 ("Pl. Br. in Opp. to City Defs.") at 12-13.]

Qualified immunity is an affirmative defense that "shields government officials from civil damages liability unless the official violated a statutory or constitutional right that was clearly established at the time of the challenged conduct." Taylor v. Barkes, 135 S. Ct. 2042, 2044 (2015) (quoting Reichle v. Howards, 132 S. Ct. 2088, 2093 (2012)). Qualified immunity will not, however, act as a shield for "the official who knows or should know he is acting outside the law." Noble v. City of Camden, 112 F. Supp. 3d 208, 225 (D.N.J. 2015) (quoting Butz v. Economou, 438 U.S. 478, 506-07 (1978)). To overcome qualified immunity, the Court must decide whether the facts alleged, taken in a light most favorable to the plaintiff, make out: (1) a

violation of a constitutional right; and 2) that the constitutional right at issue was "clearly established" at the time of a defendant's alleged misconduct. Saucier v. Katz, 533 U.S. 194, 201 (2001).

Although the question of qualified immunity is generally a question of law, "a genuine issue of material fact will preclude summary judgment on qualified immunity." Giles v. Kearney, 571 F.3d 318, 326 (3d Cir. 2009); see also Curley v. Klem, 298 F.3d 271, 278 (3d Cir. 2002) (noting that "a decision on qualified immunity will be premature when there are unresolved disputes of historical fact relevant to the immunity analysis"). In other words, the Court must deny summary judgment if on a plaintiff's version of the facts, defendants violated the plaintiff's clearly-established constitutional rights.

### 1.    Deprivation of a Constitutional Right

The threshold question for a qualified immunity analysis is whether a reasonable fact-finder could conclude that the defendant deprived the plaintiff of a constitutional right. One of the protections afforded by the Fourth Amendment of the U.S. Constitution is the right to be free from the use of excessive force by a law enforcement officer. Carswell v. Borough of Homestead, 381 F.3d 235, 240 (3d Cir. 2004) (citing Graham v. Connor, 490 U.S. 386, 395 (1989)). In deciding whether the conduct at issue rises to the level of "excessive," a court must

use an objective reasonableness standard, which "requir[es] careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." <u>Saucier</u>, 533 U.S. at 205 (citing <u>Graham</u>, 490 U.S. at 396). Other factors include, "the duration of the [officer's] action, whether the action takes place in the context of effecting an arrest, the possibility that the suspect may be armed, and the number of persons with whom the police officers must contend at one time." <u>Couden v. Duffy</u>, 446 F.3d 483, 497 (3d Cir. 2006) (quoting <u>Sharrar v. Felsing</u>, 128 F.3d 810, 822 (3d Cir. 1997)). In evaluating these factors, a court may not apply "the 20/20 vision of hindsight," but must instead recognize that police officers are often faced with split-second decisions in "circumstances that are tense, uncertain, and rapidly evolving." <u>Graham</u>, 490 U.S. at 396–97.[6]

---

[6] It is also clear that the question of whether a constitutional violation has occurred is an "essentially factual question" properly presented to the jury. <u>Monteiro v. City of Elizabeth</u>, 436 F.3d 397, 405 (3d Cir. 2006) ("Although qualified immunity is a question of law determined by the Court, when qualified immunity depends on disputed issues of fact, those issues must be determined by the jury."); Palmer v. Nassan, 454 Fed. App'x 123, 125–26 (3d Cir. 2011) ("A claim of excessive force under § 1983 requires the jury . . . to determine whether [the officer] used force that was objectively reasonable under the

Plaintiff and Defendants have two very different accounts of what transpired in the moments preceding Thomas's death. At this stage, however, the Court must "adopt[] . . . the plaintiff's version of the facts," for purposes of assessing qualified immunity. Scott v. Harris, 550 U.S. 372, 378 (2007); see also Tolan v. Cotton, 134 S. Ct. 1861, 1866 (2014); Brosseau v. Haugen, 125 S. Ct. 596, 195 n.2 (2004); Saucier, 533 U.S. at 201.

Plaintiff's version of the facts is relatively straightforward.[7] **First**, sometime after Hinson responded to the initial 9-1-1 call, he told Pratt and Wallace that if Thomas had a gun, "we will have to do what we got to do." (Wallace Dep. at 60:2-3l; see also Pratt Dep. at 59:22-60:3; Hinson Dep. at 86:2-8.) **Second**, before responding to the second 9-1-1 call, Hinson and Saunders "c[a]me up with a plan how to get this guy." (Hinson Dep. at 88:11-17.) Notwithstanding Hinson's knowledge of

---

circumstances and facts confronting him at that time, without regard to his underlying motivation.") (internal quotations and citation omitted). This is consistent with the well-established principle that jurors weigh the evidence in the record and determine the credibility of witnesses. Frank C. Pollara Grp., LLC v. Ocean View Inv. Holding, LLC, 784 F.3d 177, 184 (3d Cir. 2015) ("We must refrain from weighing the evidence, determining the credibility of witnesses, or substituting our own version of the facts for that of the jury.") (citation and alterations omitted).

[7] The Court expresses no view on the merits nor any prediction whether Plaintiff is likely or unlikely to prove these facts at trial.

Thomas's mental health issues and Pratt's assurances that Thomas was not dangerous, Hinson and Saunders then carried out what Hinson described as a "tactical approach" and "felony car stop," whereby the Officers turned their car lights off as they approached Thomas and assumed a threatening position behind their car doors with their weapons pointed at Thomas. (Id. at 88:11-90:6.) **Third**, Pratt, Wallace, and Rodriguez testified that, right before he was shot, Thomas was either unarmed or not brandishing a gun, while Pratt, Wallace, Rodriguez, and Harris testified that, at the time he was shot, Thomas was in some sort of a surrendering position. **Fourth,** Detective Jones' investigation revealed that, despite various Officers' and Troopers' testimony that they believed Thomas fired his weapon, there was no evidence the .380 semiautomatic pistol recovered on or near Thomas's person discharged any bullets during the shooting incident on November 12, 2011. (Jones Decl. at ¶ 7.)

The version of facts most favorable to Plaintiff is that Mr. Thomas did not have a gun in his hand and did not brandish a gun at the law enforcement officers. Given these facts, a jury could reasonably conclude that Thomas did not pose a risk of death or serious bodily injury to others and that the Officers and Troopers could not reasonably believe he did. Therefore, the Court finds that material issues of fact exist as to whether

Defendants use of deadly force was unreasonable and, therefore, violated Thomas's Fourth Amendment rights.

### 2. Clearly Established Right

Having determined that a jury could find that the individual Officers and Troopers' use of force was unreasonable, the Court next considers whether Thomas' constitutional right at issue was clearly established. Saucier, 533 U.S. at 201. "To be clearly established, a right must be sufficiently clear that every reasonable official would have understood that what he is doing violates that right." Taylor, 135 S. Ct. at 2044 (quoting Reichle, 132 S. Ct. at 2093)); see also Spady v. Bethlehem Area Sch. Dist., 800 F.3d 633, 637 n.4 (3d Cir. 2015) (holding that a district court "may not deny a summary judgment motion premised on qualified immunity without deciding that the right in question was clearly established at the time of the alleged wrongdoing") (citation omitted).

In November 2011, the law was well-established that police officers may not use deadly force against a suspect who poses no threat of serious bodily injury to the officer or others. See, e.g., Tennessee v. Garner, 471 U.S. 1, 11 (1985) ("A police officer may not seize an unarmed, nondangerous suspect by shooting him dead."); Abraham v. Raso, 183 F.3d 279, 288 (3d Cir. 1999) ("[T]he government's interest in effective law enforcement was insufficient to justify killing fleeing felons

who did not pose a significant threat of death or serious injury to anyone."). Adopting Plaintiff's version of the events, as the Court must do on these motions for summary judgment, an objectively reasonable officer would, therefore, have known that opening fire on an unarmed man who had his hands up and was in a surrendering position is unlawful and constitutes excessive force. Accordingly, the Court concludes that none of the individual Officers or Troopers are entitled to qualified immunity at this stage.[8]

### B.  U.S. Constitutional Claims (Counts One, Two, and Three) and New Jersey Constitution and New Jersey Civil Rights Act Claims (Count Twelve)

#### 1.  1983 Claims Against Individual Officers and Troopers (Count Three)

Defendants argue that the § 1983 claims in Count Three against Officers Hinson and Saunders and Troopers May, Moore, Moran, Nuemann, and Smith, in their individual capacities, should be dismissed because, under the totality of the circumstances, the use of deadly force upon Thomas was reasonable. (City Defs. Br. at 4-7; State Defs. Br. at 21-33,

---

[8] Because the question of qualified immunity is ultimately a question for the Court, this conclusion may change based on the facts found by the jury at trial. <u>Curley</u>, 499 F.3d at 214 ("The jury was not bound at trial, and the District Court was not bound post-trial, by our earlier statements involving a hypothetical set of facts favoring Curley, since the facts and inferences actually found by the jury were clearly different than those which we were required to posit in <u>Curley</u> when considering the summary judgment order.").

44.) For the reasons discussed at length in Section VI.A.1, supra, a reasonable jury could conclude that the individual Officers' and Troopers' use of deadly force against Thomas was excessive and unreasonable. Accordingly, summary judgment will be denied as to Count Three.

### 2. Monell Claims (Counts One and Two)

Plaintiff clarified at oral argument that the Monell claims in Counts One and Two are against the City of Camden and Chief Thomson, not against the State of New Jersey or Superintendent Fuentes. Plaintiff also clarified that these Monell claims are based solely upon Camden's alleged failure to properly train Officers Hinson and Saunders, rather than for failure to properly hire, supervise, discipline, and/or control those Officers. Accordingly, the Court will treat Counts One and Two as Monell claims against the City of Camden and Chief Thomson for failure to properly train its officers how to interact with mentally-disturbed persons.

The City Defendants argue that the City of Camden and Chief Thomson, in his official capacity, cannot be subject to liability under § 1983 because "Plaintiffs' generalized allegations of Monell liability are lacking in factual support," and "Plaintiffs cannot demonstrate a plausible nexus or affirmative link between any of the alleged bases for Monell liability and the death of Thomas." (City Defs. Br. at 13-14.)

The City Defendants also argue in their reply brief that the report produced by Plaintiff's proffered expert, Dr. James Williams, [Ex. 3 to Docket Item 148-1 ("Dr. Williams Rep.")] is inadmissible under Rules 702 and 703, Fed. R. Civ. P., and Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579 (1993). [See Docket Item 148 ("City Defs. Reply Br.") at 15-22.]

Notwithstanding that CCPD provides use of force training to its officers, Plaintiff alleges that Officer Hinson's and Saunders' training was inadequate and resulted in the death of Thomas. Specifically, Plaintiff alleges that "the City of Camden and [Chief] Thomson failed to enact policy and training programs for its officers in how to encounter mentally ill or emotionally disturbed persons" until nearly three weeks after the death of Thomas. (Pl. Br. in Opp. to City Defs. at 25-26.) Notably, Plaintiff did not rely upon Dr. Williams's report anywhere in the briefs opposing either the City or State Defendants' motions for summary judgment. (See id. at 24-30; Pl. Br. in Opp. to State Defs. Br. at 19-23.) Nor did Plaintiff address the City Defendant's challenge to the admissibility of Dr. Williams's report or testimony at oral argument. As things stand, Plaintiff's position on the admissibility of Dr. Williams's report and testimony thus lacks clarity.

### a.   Failure to train claim

It is well established that municipal liability under §
1983 "may not be proven under the respondeat superior doctrine,
but must be founded upon evidence that the government unit
itself supported a violation of constitutional rights."
Bielevicz v. Dubinon, 915 F.2d 845, 850 (3d Cir. 1990) (citing
Monell v. New York City Dep't of Soc. Servs., 436 U.S. 658
(1978)). As a consequence, a municipality is liable under § 1983
only when "execution of a government's policy or custom, whether
made by its lawmakers or by those whose edicts or acts may
fairly be said to represent official policy, inflicts the
injury." Monell, 436 U.S. at 694. Where a municipal policymaking
official, such as Chief Thomson, is sued in his official
capacity, the claim is treated as a suit against the
municipality – here, the City of Camden. See A.M. ex rel. J.M.K.
v. Luzerne Cty. Juvenile Detention Ctr., 372 F.3d 572, 580 (3d
Cir. 2004).

Where the policy at issue "concerns a failure to train or
supervise municipal employees, liability under section 1983
requires a showing that the failure amounts to deliberate
indifference to the rights of persons with whom those employees
will come into contact." Thomas v. Cumberland Cty., 749 F.3d
217, 222 (3d Cir. 2014) (quoting City of Canton v. Harris, 489
U.S. 378, 388 (1989)). Moreover, "the deficiency in training

must have actually caused the constitutional violation." <u>Thomas</u>, 749 F.3d at 217 (quoting <u>Canton</u>, 489 U.S. at 391).

The Supreme Court has made clear that "[d]eliberate indifference is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." <u>Bd. of Cty. Comm'rs of Bryan Cty., Okl. v. Brown</u>, 520 U.S. 397, 410 (1997) (internal quotations omitted). "A pattern of similar constitutional violations by untrained employees is 'ordinarily necessary' to demonstrate deliberate indifference for purposes of failure to train." <u>Connick v. Thompson</u>, 131 S. Ct. 1350, 1360 (2011) (internal citation omitted). Nevertheless, in certain situations, the need for training "can be said to be 'so obvious,' that failure to do so could properly be characterized as 'deliberate indifference' to constitutional rights." <u>Canton</u>, 489 U.S. at 490 n.10 (internal citation omitted). Liability in single-incident, failure-to-train cases thus depends on "[t]he likelihood that the situation will recur and the predictability that an officer lacking specific tools to handle that situation will violate citizens' rights." <u>Bryan Cty.</u>, 520 U.S. at 409.

In the present case, Plaintiff has offered no evidence of a history or pattern of excessive force against mentally-disturbed persons by the Camden City Police Department, and thus must rely on a single-incident theory of liability. Accordingly, this

Court must consider whether a reasonable jury could find that
the risk of Thomas's death was a "highly predictable
consequence" of the City of Camden's failure to train its
Officers how to properly respond to mentally-disturbed persons
who are potentially armed and dangerous. Id. (citing Canton, 489
U.S. at 390 n.10). The Court will not reach this question until
it can first discern Plaintiff's position on the admissibility
of Dr. Williams's report and testimony, which, at present, the
Court cannot do.

### b.   Dr. Williams's report and testimony

Generally, where the Third Circuit has concluded that
failure-to-train claims may proceed to a jury, a plaintiff was
able to produce the opinion of a qualified expert who could
testify that a municipality's policies and/or procedures were
defective and that this training, or lack thereof, caused the
constitutional deprivation of which the plaintiff complains.
See Thomas, 749 F.3d at 225–26 (noting that plaintiff "provided
expert opinion evidence that the failure to provide conflict de-
escalation and intervention training was a careless and
dangerous practice not aligned with prevailing standards," as
well as expert testimony regarding causation); A.M. ex rel.
J.M.K., 372 F.3d at 582 (observing that plaintiff presented
unrebutted expert testimony that defendant "did not have an
adequate training program for its staff and did not meet

34

nationally recognized standards for training," and that
defendant's failure to train and follow recognized standards
resulted in plaintiff's inappropriate treatment). While expert
testimony may not necessarily be required to prove a claim for
failure to train in this Circuit, see Drake v. Andruczyk, 2011
WL 1402158, at *4 (D.N.J. Apr. 13, 2011), in some cases "expert
testimony may prove the sole avenue available to plaintiffs to
call into question the adequacy of a municipality's training
procedures." Russo v. City of Cincinnati, 953 F.2d 1036, 1047
(6th Cir. 1992).

    As relevant here, Plaintiff's expert, Dr. Williams, opined
that "the City of Camden Police Department and its
Administration demonstrated a deliberate indifference to the
departmental need for policy and procedures for the training and
operational mandates for the effective interactions with
mentally ill persons." (Dr. Williams. Rep. at 8.) In their reply
brief, the City Defendants have challenged the reliability and
admissibility of Dr. Williams's report and testimony under Rules
702 and 703, Fed. R. Civ. P., and Daubert, 509 U.S. 579. (City
Defs. Reply Br. at 15-22.) Plaintiff has not responded to the
State Defendants' Daubert challenge and, as noted above,
Plaintiff's position on the admissibility and probative value of
Dr. Williams's opinions lacks clarity.

Accordingly, the Court will give Plaintiff fourteen (14) days to file supplemental briefing addressing the admissibility and probative value of Dr. Williams's report and testimony regarding the City of Camden's deliberative indifference to the need for training. Thereafter, the City Defendants will be given seven (7) days to file a supplemental response. If necessary, the Court will conduct a Daubert hearing. The Court will then rule on the admissibility of Dr. Williams's report and testimony and decide the motion for summary judgment as to the City of Camden and Chief Thomson as to Counts One and Two.

Given Plaintiff's concession at oral argument, the Court will grant summary judgment on Counts One and Two as to the State of New Jersey and Superintendent Fuentes.

### 3. New Jersey Constitution and New Jersey Civil Rights Act Claims (Count Twelve)

Defendants argue that the claims against all Defendants for violation of the N.J. Civil Rights Act should be dismissed for the same reasons Plaintiff's claims under § 1983 should be dismissed. (City Defs. Br. at 19-20; State Defs. Br. at 42-44.) For the reasons discussed in Sections IV.A.1 and IV.B.1, supra, a reasonable jury could conclude that the individual Officers' and Troopers' use of deadly force against Thomas was excessive and unreasonable. Accordingly, summary judgment will be denied

as to Count Twelve with respect to the individual Officers and Troopers, in their individual capacities.

Because Plaintiff conceded at oral argument that the Eleventh Amendment of the U.S. Constitution isolates the State Defendants in their official capacities from liability under § 1983, summary judgment will be granted as to the State of New Jersey and Superintendent Fuentes, in his official capacity, on Count Twelve.

For the reasons discussed in Section IV.B.2, the Court will defer decision on summary judgment as to the City of Camden and Chief Thomson in his official capacity on Count Twelve, pending the supplemental briefing regarding Dr. Williams's opinions and their probative value to Plaintiff's claims concerning improper training.

### C. Negligence Claims (Counts Seven, Eight, and Nine)

#### 1. Negligence Claims Against Individual Officers and Troopers (Count Nine)

Count Nine alleges negligence against the individual Officers and Troopers under New Jersey law. (Second Am. Compl. at ¶¶ 100-107.) Defendants argue that the individual Officers and Troopers are immune from liability for negligence under the New Jersey Tort Claims Act.[9] (City Defs. Br. at 15-17; State

---

[9] At oral argument, the City and State Defendants both conceded that Plaintiff has met the N.J.S.A. § 59:9-2(d) threshold requirement of the New Jersey Tort Claims Act because Thomas

Defs. Br. at 39-40.) Generally, the New Jersey Tort Claims Act immunizes "public entities and public employees" who "act[] in good faith in the execution or enforcement of any law." N.J.S.A. § 59:3-3. Additionally, police officers and other public employees are not liable for "any injury caused by . . . a person resisting arrest or evading arrest." N.J.S.A. § 59:5-2(b). To obtain such immunity at the summary judgment stage, a public employee must "establish that [his or her] acts were objectively reasonable or that [he or she] performed them with subjective good faith." Canico v. Hurtado, 676 A.2d 1083, 1085 (N.J. 1996). In other words, "the public employee must come forward with proof of a nature and character that would exclude any genuine dispute of fact as to the application of immunity." Leang v. Jersey City Bd. of Ed., 969 A.2d 1097, 1112 (N.J. 2009) (internal quotations and citations omitted). Examining the evidence in the light most favorable to Plaintiff and resolving all reasonable inferences in her favor,[10] the individual Officers

---

suffered a "permanent loss of a bodily function." See generally Brooks v. Odom, 696 A.2d 619 (N.J. 1997).

[10] As noted supra, Plaintiff has put forth four eyewitnesses who testified that Thomas was unarmed and/or not brandishing a gun and/or in a surrendering position at the time he was shot. The individual Officers and Troopers all testified that Thomas was pointing and trying to fire a gun at them. This dispute of material fact can only be resolved by a jury.

and Troopers have not satisfied this burden. Accordingly, summary judgment will be denied as to Count Nine.

      2.   <u>Negligence Claims Against City of Camden, Chief Thomson, and Superintendent Fuentes (Counts Seven and Eight)</u>

In Counts Seven and Eight, Plaintiff brings negligence claims against the City of Camden (but not the State of New Jersey), and Chief Thomson and Superintendent Fuentes in their official capacities (Second Am. Compl. at ¶¶ 86-99), which are limited to allegations of negligent training of law enforcement officers involved in the shooting.[11]

The City of Camden and Chief Thomson argue that the supervisory liability claims against them should be dismissed because Officers Hinson and Saunders were properly supervised and trained at all times during their employ as CCPD law enforcement personnel. (City Defs. Br. at 12-13.) For the reasons discussed in Section IV.B.2, the Court defers decision on whether summary judgment should be granted as to the City of Camden and Chief Thomson in his official capacity on Counts

---

[11] Plaintiff clarified at oral argument that the factual basis that formed the negligence counts against the City of Camden, Chief Thomson, and Superintendent Fuentes in Counts Seven and Eight is limited to allegations of negligent training of law enforcement officers involved in the shooting (rather than for negligently properly hiring, supervising, disciplining, and/or retaining those officers).

Seven and Eight until the admissibility of Dr. Williams's report and testimony is determined.

The State Defendants argue that Count Eight claims against Superintendent Fuentes should be dismissed because Plaintiff's supervisory liability claims are premised upon the "impermissible" theory of respondeat superior. (State Defs. Br. at 17-21.) While Plaintiff's counsel did not specifically withdraw the negligence claim against Superintendent Fuentes in Count Eight at oral argument as he did the <u>Monell</u> claims against the State of New Jersey and Superintendent Fuentes in Counts One and Two, Plaintiff's briefing in support of supervisory liability against Superintendent Fuentes expressly relies upon <u>Monell</u>. (<u>See</u> Pl. Br. in Opp. to State Defs. Br. at 19-23.) Indeed, the heading of the section in Plaintiff's brief addressing Superintendent Fuentes's supervisory liability reads "Point II: PLAINTIFFS' SUPERVISORY CLAIMS AGAINST DEFENDANTS ARE VALID DUE TO <u>MONELL</u>." (<u>Id.</u> at 19.) Further, the Court can adduce little (if any) factual support from the record to support a claim for supervisory liability against Superintendent Fuentes, in his official capacity. Accordingly, summary judgment will be granted in favor of Superintendent Fuentes on Count Eight.

**D. Other Claims (Counts Six, Ten, and Eleven)**

    1. <u>New Jersey Law Against Discrimination Claims (Count Six)</u>

In Count Six, Plaintiff asserts a claim against all Defendants under the New Jersey Law Against Discrimination ("NJLAD"). The Second Amended Complaint is rather unenlightening about the contours of this NJLAD claim for discrimination on the basis of Mr. Thomas's mental disability.[12] Plaintiff has voluntarily dismissed related claims under the Americans with Disabilities Act (Count Four) and the Rehabilitation Act of 1973 (Count Five), as noted above. Other than noting that NJLAD claims for discrimination based on disability are analogous to such claims under the Americans with Disabilities Act, the briefing gives almost no attention to the NJLAD claims and whether Defendants are entitled to judgment as a matter of law, no material facts being in dispute.[13]

---

[12] The Sixth Count of the Second Amended Complaint provides in its entirety:

    84. Plaintiff re-alleges and incorporates herein by reference paragraphs 1 through 83 above.

    85. Defendants discriminated against Mr. Thomas as a person with a disability and denied him a reasonable accommodation in violation of his rights under the New Jersey Law Against Discrimination.

(Second Am. Compl.)

[13] <u>See</u> State Defs. Br. at 38-39; City Defs. Br. at 9-10; Pl. Br. in Opp. to State Defs. at 33-34; Pl. Br. in Opp. to City. Defs.

Plaintiff relies upon the NJLAD at N.J.S.A. § 10:5-12 (cited in Pl. Br. in Opp. to State Defs. [Docket Item 142] at 33). The NJLAD at N.J.S.A. § 10:5-12 addresses itself to unlawful employment practices, specifically, "[f]or an employer, because of . . . disability . . . to refuse to hire or employ . . . such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment. . . ." N.J.S.A. § 10:5-12a. This statute at N.J.S.A. § 10:5-12a does not apply to Plaintiff's decedent because he was not an employee of any Defendant. Similarly, the other subsections of § 10:5-12, including subsections b-q, protect disabled persons from discriminatory conduct of, for example, labor unions, realtors, financial institutions, and landlords, all of which are inapplicable here.

Plaintiff, in short, does not identify a statutory provision of the NJLAD or of New Jersey case law that would regulate the conduct of law enforcement officers in subduing a disabled person who is believed to be armed and dangerous. It is not the Court's responsibility to fill in the legal and evidentiary gaps in Plaintiff's NJLAD claim that remain after briefing.

---

(not addressing NJLAD at all); State Defs. Reply Br. (not addressing NJLAD again); City Defs. Reply Br. (not addressing NJLAD again).

Accordingly, upon the present record, there is no prospect that a reasonable fact-finder could render a verdict for Plaintiff on the NJLAD claim in Count Six. Defendants are therefore entitled to summary judgment upon Plaintiff's NJLAD claim in Count Six.

> 2. IIED Claims Against All Defendants (Count Ten) and Unpled NIED Claims Against the State Defendants Under Portee v. Jaffee

In Count Ten, Plaintiff brings a claim for IIED against all Defendants, alleging that "Defendants' act of shooting Mr. Thomas in front of his mother and fiancé was done with the intent of causing, or with reckless disregard for the probability of causing, emotional distress to plaintiff." (Second Am. Compl. at ¶ 110.) The Defendants argue that the IIED claims should be dismissed because Plaintiff has not established the necessary elements to support such a claim. (State Defs. Br. at 41-42; City Defs. Br. at 19.)

To prevail on an IIED claim, a plaintiff "must establish intentional and outrageous conduct by the defendant, proximate cause, and distress that is severe." Tarr v. Ciasulli, 853 A.2d 921, 924 (N.J. 2004) (quoting Buckley v. Trenton Saving Fund Soc., 544 A.2d 857, 863 (N.J. 1988)). "For an intentional act to result in liability, the defendant must intend both to do the act and to produce emotional distress." Id. "Liability will also attach when the defendant acts recklessly in deliberate

43

disregard of a high degree of probability that emotional distress will follow." Id. (citing Hume v. Bayer, 428 A.2d 966, 971 (N.J. Super. Ct. Law Div. 1981)).

Plaintiff has put forth no evidence from which it could be reasonably inferred that any of the Officers or Troopers intended to produce emotional distress or acted recklessly in deliberate disregard of a high degree of probability that emotional distress would follow with respect to Plaintiff Pratt (as opposed to the deceased, Mr. Thomas). Accordingly, summary judgment will be granted in favor of Defendants on Plaintiff's IIED claims.

Notwithstanding the dismissal of Plaintiff's IIED claims, in the interest of justice and judicial economy, the Court will permit Plaintiff to file a motion to amend Count Ten to add a so-called "Portee claim" against the individual Officers and Troopers. See Fed. R. Civ. P. 15(a)(2) (leave to amend should be freely given when justice so requires); Newark Branch, N.A.A.C.P. v. Town of Harrison, N.J., 907 F.2d 1408, 1417 (3d Cir. 1990) (leave to amend can be given "even after judgments of dismissal have been entered").

To set forth a Portee claim for negligent infliction of emotional distress, a plaintiff must establish four elements: "(1) the death or serious physical injury of another caused by defendant's negligence; (2) a marital or intimate, familial

44

relationship between plaintiff and the injured person; (3) observation of the death or injury at the scene of the accident; and (4) resulting severe emotional distress." _Portee v. Jaffee_, 417 A.2d 521, 528 (N.J. 1980). Here, the Court finds that it might not be futile for Plaintiff, a mother who directly witnessed her son's death from less than 200 feet away, to add such a claim. Accordingly, the Court will grant Plaintiff leave to file a motion to amend Count Ten of the Second Amended Complaint to replace Plaintiff's IIED claim with a _Portee_ claim.

### 3. Wrongful Death Claims Against All Defendants (Count Eleven)

In Count Eleven, Plaintiff brings a claim against all Defendants under the New Jersey Wrongful Death Act (Sec. Amended Compl. at ¶¶ 112-114), which provides, in relevant part, for the recovery of damages for "pecuniary injuries resulting from such death, together with the hospital, medical and funeral expenses incurred for the deceased, to the persons entitled to any intestate personal property of the decedent." N.J.S.A. § 2A:31-1. Defendants argue that these claims should be dismissed because the individual Officers and Troopers did not commit any tortious act (City Defs. Br. at 19), and because law enforcement officers are entitled to immunity under the Tort Claims Act from liability resulting from injuries caused to an individual who resists being arrested. (State Defs. Br. at 39-40) (citing _Blunt_

v. Kapproth, 707 A.2d 1021, 1029 (N.J. Super. Ct. App. Div. 1998)). For the reasons discussed in Sections IV.A and IV.C, supra, there are genuine disputes of material fact as to whether the individual Officers and Troopers engaged in tortious conduct and whether Mr. Thomas was resisting arrest or was in a surrendering position before he was shot. Accordingly, summary judgment will be denied as to Count Eleven.

### E. Whether Punitive Damages May Be Awarded

Among other requests for relief, Plaintiff asks "[f]or punitive damages in amount to be established at trial against each Defendant who can be made liable for punitive damages." (Second Am. Compl. at 24.) Defendants argue that there is no evidence any individual Officer or Trooper acted with the requisite state of mind or with reckless indifference necessary to support a claim for punitive damages. (City Defs. Br. at 17-18; State Defs. Br. at 44.) Unsurprisingly, Plaintiff disagrees. (Pl. Br. in Opp. to City Defs. at 36-37; Pl. Br. in Opp. to State Defs. at 37-38.)

Punitive damages may be awarded "when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others" Alexander v. Riga, 208 F.3d 419, 431 (3d Cir. 2000) (internal quotations and citation omitted). Such damages can be awarded "in a civil rights case

where a jury finds a constitutional violation, even when the
jury has not awarded compensatory or nominal damages." Id. at
430. Just as factual disputes abound regarding the
circumstances, knowledge, and motives of the Officers and
Troopers that precluded qualified immunity, see Section IV.A,
supra, so too could a reasonable jury find that the individual
Officers and Troopers acted with the requisite state of mind to
award punitive damages to Plaintiff. See also Simmermon v.
Gabbianelli, 965 F. Supp. 2d 589, 605 (D.N.J. 2012) (combining
the qualified immunity and punitive damages inquiries because "a
jury could find a lack of qualified immunity and impose punitive
damages for essentially the same reasons). In other words,
factual disputes that preclude granting summary judgment for the
individual Officers and Troopers on Plaintiff's claims for
excessive use of force and wrongful death also require denial of
their motion to dismiss punitive damages claims arising
therefrom. Accordingly, the individual Officers and Troopers are
not entitled to summary judgment as to punitive damages.

# V. CONCLUSION

For the foregoing reasons, the Court will grant in part and deny in part Defendants' motions for summary judgment. An accompanying Order will follow.


**June 29, 2018**                                    **s/ Jerome B. Simandle**
Date                                                 JEROME B. SIMANDLE
                                                     U.S. District Judge